St. Eve International, Inc., plaintiff *v.* United States, defendant

Court No. 85–10–01447

*Goldman, Greenbaum, and Milner (Sheldon M. Greenbaum* at the trial and on the briefs) and *Coudert Brothers (Robert L. Eisen* at the trial and on the briefs) for the plaintiff.

*Richard K. Willard,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Civil Division, Department of Justice (*Veronica Perry* at the trial and on the briefs) for the defendant.

Rao, *Judge:* The merchandise involved in this civil action consists of 100 per cent cotton knit garments imported from Hong Kong in 1985, claimed by the plaintiff to be "pajamas and other nightwear" under Textile Quota No 351, pursuant to item no. 383.3020 of the Tariff Schedules of the United States (TSUS), as amended, dutiable at the rate of 12.3 per cent *ad valorem.*

The United States Customs Service (Customs) determined that the imported merchandise was properly classifiable as dresses, blouses or shirts, and that the export visa issued by the Hong Kong Trade Department in Textile Quota Category No. 351 was not acceptable. The merchandise was excluded from entry.

Pursuant to 19 U.S.C. sec. 514(a)(4), plaintiff protested the exclusion of the merchandise by Customs. This protest was denied and plaintiff subsequently commenced this action.

It is plaintiff's claim that the merchandise is chiefly used as pajamas and nightwear, that this use exceeds all other uses, and that the merchandise is designed, manufactured, and marketed as nightwear, and must be classified as nightwear for Tariff Schedule purposes.

It is defendant's position that the merchandise, even though it is designed, manufactured and marketed as nightwear, is chiefly used by the ultimate consumer as outerwear, i.e., blouses, shirts and dresses.

The merchandise consists of twentyfive styles of 100% cotton knit garments for women, alleged by the plaintiff to be representative of all its nightgown, night shirt and nightwear articles imported into the United States. Generally, the silhouette of the garments is such that the garments are non-confining, and the width at the bottom of the garment is larger than the width at the shoulders, unless the garment has slits at the hemline. The garments are in a variety of colors, some are in bright colors not generally associated with sleepwear, and some have "wild" prints which may cover the front of the garment from the collar to the hem. Some garments are hemmed above the knee and some below.

It is the plaintiff's position that these and similar garments had been entered as pajamas and other nightwear, with Customs' approval from 1981 to 1985. During this time, however, the "oversized" trend took hold in the fashion industry, and all types of garments, including dresses, shirts, sweaters, nightwear, coats and jackets, adapted to the "new" oversized look, which consists of regular contours at the neck and larger than regular sizes on all other aspects of the garment. Additionally, consumers realized that garments that were designed for one use could be worn successfully for a different use, and women began wearing nightgowns as formal gowns and knit shirts as beach coverups or sports tops, among other things. It is defendant's position that the imported merchandise is chiefly used as other than nightwear and belongs to a class or kind of wearing apparel known in the fashion industry as an oversized garment.

Plaintiff relies on *Mast Industries* v. *United States,* 10 CIT 549, Slip Op. 85–114 (1985), *aff'd* 786 F.2d 1144 (CAFC, April 1, 1986), in which this Court (Di Carlo, J.) found garments classified as "shirts" by Customs to be properly classifiable as nightshirts, based on *in*

*camera* inspection of the merchandise and a trial which established the design intention of the manufacturer and the methods by which the merchandise was marketed and advertised.

Both parties rely on *United States* v. *Carborundum Co.,* 63 CCPA 98, C.A.D. 1172, 536 F.2d 373 (CAFC) Cert. den., Carborundum Co. v. *United States,* 429 U.S. 979 (1976), in which our appeals court established criteria to be applied in determining the chief use of an imported article, taking into consideration the requirements of General Interpretive Rule 10(e)(i) of the TSUS which, in the absence of special language or context, requires for a tariff classification controlled by use (other than actual use), that the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, that the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined. In determining in which class or kind the imported article belongs, the Court set out the following circumstances to be considered: the general physical characteristics of the merchandise, the expectations of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale and the manner in which the merchandise is advertised and displayed, the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use. (at 102).

Plaintiff has attempted to establish that the instant merchandise belongs to the class or kind of merchandise consisting of "pajamas and other nightwear." If it has succeeded, the imported merchandise must be classified as plaintiff contends and classification as dresses, blouses or shirts is precluded, despite the presumption of correctness which attaches to Customs' classification.

Plaintiff relies on various lexicographic definitions of terms used in the TSUS and in the fashion industry. Some of these definitions have been adopted by our Court in decisions affecting other merchandise and we accept them as well in this case:

> *Pajamas and other nightwear.* Pajamas are worn by both sexes and all ages. They consist of an upper part of pullover or coat style, with long, short or no sleeves and a lower part of short, intermediate, or long trouser-like garments or any style panties. The lower part sometimes extends to and encloses the feet. Most pajamas are sleepwear, but the term and the category include others such as beach, lounging and hostess pajamas. Garments called "sleepers" (sometimes called Dr. Denton's) or one- or two-piece sleeping garments for children, buttoning in front or back with drops seats in the one-piece style, are in this category.
>
> The term "night-wear" is interpreted as meaning "sleepwear" so that certain garments worn in bed in the daytime, as by infants or the bedridden, are included. "Other nightwear" includes various articles worn for sleeping, such as nightgowns,

nightshirts, "waltz gowns," etc. *Textile Category Guidelines for Fabric And Garments Reported Under Various Textile Categories,* United States Customs Service, Customs Information Exchange 36/79.

*Sleepwear.* Same as nightclothes. *Webster's New World Dictionary of the English Language,* (1974).

*Night clothes.* Garments to be worn to bed. *Mast Industries, Inc.* v. *United States, supra* at p. 7.

*Nightgown.* A garment resembling a dress designed for wear in bed. *Mast, supra, Id.*

*Nightshirt.* A nightshirt resembling a shirt. *Mast, supra, Id.*

*Blouse.* A loose, shirtlike garment extending to the waistline or just below, worn by women and children. *Webster's New World Dictionary of the American Language* (1974).

*Shirt.* The usual sleeve garment worn by men on the upper part of the body, often under a vest or jacket, typically having a collar and a buttoned opening down the front; a similar garment for women, *Websters, supra.* Also, "a garment for the upper part of the body; as a: a loose cloth garment usually having a collar, sleeves, a front opening, and a tail long enough to be tucked inside the waistband of trousers or a skirt. *Mast, supra, Id.*

*Dress.* The usual outer garment worn by women, generally of one piece with a skirt. *Websters, supra.*

Plaintiff's witnesses agreed with these definitions and testified that the 25 garments at issue were used as sleepwear and not as dresses, blouses or shirts.

Plaintiff's witness, Allan Myerson, President of plaintiff corporation, testified that the merchandise is designed, manufactured and advertised by plaintiff as sleepwear. It is designed to be suitable to be worn to bed, in a loose silhouette, with flat seams, large neck and bottom openings, with few buttons, which when used are generally flat, and no zippers, gores or insets. The fabric is a light weight 100% cotton knit which is machine washable and dryable (even though the care instruction labels provided by the manufacturer recommend flat drying), but some shrinkage results when the garments are machine dried. Mr. Myerson testified that the fabric is unsuitable for dresses or shirts, since its sheerness would reveal the contours of the person wearing it, but that it is suitable for sleepwear, which is usually limited to wear in the presence of immediate family members.

The garments are manufactured as sleepwear. St. Eve's principle place of business is in the lingerie and nightwear district of New York City, rather than in the sportswear district, which is across town. It is regarded as a resource for underwear (it also manufactures panties and tops) and sleepwear by buyers from department

stores throughout the country, although *Women's Wear Daily* has on one occasion listed it as a resource in leisure wear. The factories in Hong Kong which manufacture the garments do not produce dresses, blouses and shirts and the Hong Kong Board of Trade recognizes plaintiff as a manufacturer of sleep wear.

Plaintiff advertises its garments in sales catalogues and in the fashion media as sleepwear. It gives advertising allowances to its retailers who advertise plaintiff's garments in their own catalogues and sales pamphlets, although it has no control over the way in which the retailers will present the merchandise. Mr. Myerson has seen over 200 of these catalogues and brochures and in his opinion most of them depicted the garments for sleepwear uses.

Defendant introduced into evidence a number of retailing brochures in which the suggested use of the merchandise was as sportswear, e.g., as a beach cover up, as a top over jeans or skirts, or belted, as a dress. The garments were depicted in outofdoors locations, but this is not unusual for sleepwear garments since purchasers become uneasy when sleepwear is depicted near or on the bed. Defendant did not establish that the number of brochures or advertisements depicting uses other than as sleepwear exceeded those that depicted sleepwear uses.

Defendant did establish that at the retail level, sales persons may suggest other than sleepwear uses for the garments, although plaintiff established that consumers tend to use merchandise in the same manner as it is advertised and marketed, and that they shop for sportswear in sportswear departments and for sleepwear in sleepwear departments. It also established that department store sportswear buyers do not generally buy sleepwear, nor sleepwear buyers, sportswear and that only sleepwear buyers purchase this merchandise.

Witnesses for both parties admitted that the ultimate use to which the merchandise is put can not be dictated by the manufacturer or the retailer, and that the merchandise can be used for unintended purposes. Neither party had done a consumer survey to determine how the ultimate consumer actually used the garments in issue, or if they used it for more than one purpose, which use predominated.

Two of plaintiff's witness, qualified as experts in the field of wearing apparel, had broad knowledge of how the garments in question are purchased by retail chains throughout the United States and how they are presented and sold in these stores: Susan Gardner Frankiewisz, associated with the Federated Merchandising Group with stores in Florida, Massachusetts, California, Texas, Colorado, Ohio, New Jersey, Pennsylvania and New York; and Charlene Gordon Reagan, familiar with intimate apparel marketing in California, Texas, Florida, Georgia, Massachusetts, Ohio, Tennessee and New York. It was their testimony that the instant merchandise is chiefly used as nightwear. Plaintiff's additional expert witness,

Nurie Relis, Professor of Fashion Design as the Fashion Institute of Technology, who teaches courses in loungewear and sleepwear, also testified that the imported merchandise belongs to the class or kind of merchandise known as nightwear and was chiefly used as such. Thus, the testimony as to the channels of trade in which the merchandise moves favors the plaintiff.

The garments are priced within the same range as other sleepwear and not in the range of oversized "T" shirts, which sell for as little as $3.99 as opposed to plaintiff's merchandise which generally sells for above $20.00 per item, retail. Plaintiff also established that sales of the merchandise are fairly constant throughout the year, with minor peaks during gift giving seasons, such as Christmas and Mothers Day. This would preclude a conclusion that its use as a beach cover up or over jeans and a skirt exceeds sleepwear use, since those uses would be summer uses and result in higher sales in presummer and summer seasons.

The evidence to be weighed as to the environment of the sale contained some conflict. Plaintiff's witnesses and most of the sales brochures introduced into evidence (including those offered by the defendant) established that the merchandise is sold mainly in the sleepwear departments of major retail stores throughout the country. Defendant's witnesses testified that similar merchandise is sold in both the sleepwear and the sportswear departments, although the similarity between plaintiff's garments and those sold in sportswear departments appears to be mostly visual, since the plaintiff's garments are of 100% cotton knit fabric and some of the garments alluded to by defendant's witnesses were of 100% polyester or some blend of cotton and synthetic fabric. Plaintiff's witness, Mrs. Eisen, who shopped five department stores in two states to purchase the merchandise in question, found them in the sleepwear departments and not in the sportswear departments. In each case, she was given a sales slip covering the articles which characterized them as sleepwear.

On the other hand, Susan Cantor, a Special Agent for the United States Customs Service, conducted an investigation of the merchandise in question and of oversized "T" shirts not manufactured by plaintiff. Her testimony established that she purchased oversized "T" shirts manufactured by St. Eve at Macy's, Bloomingdales and Saks Fifth Avenue in New York and Lord & Taylor and Saks Fifth Avenue in New Jersey. She was told by the sales persons at these stores that the garments could be and were being worn by women out of doors and over jeans and bathing suits. She also purchased oversized "T" shirts not manufactured by plaintiff in various stores in New York where they were found in sportswear stores or departments and where they were described as suitable for wear over jeans and bathing suits. While Ms. Cantor's testimony as to what she did during her investigation is credible, her testimony as to

what was said to her by unidentified salespersons who are unavailable for cross examination is inadmissible. Additionally, since her investigation was limited to a small area of New York and New Jersey, it is not probative of the manner in which the merchandise in question is sold and used throughout the United States.

As to the practicality of using the import in the same manner as the rest of the class or kind, plaintiff established that the garments are longer than most blouses and shirts, would be too bulky to be tucked into a skirt or pants, that many of the prints, which are positioned from neck to hem, would be interrupted and lose their design value by being either belted or tucked into skirts or pants, and that the fabric is too sheer to be worn out of doors without undergarments. Defendant demonstrated, through the use of a model and several of the garments at issue, that the merchandise can be used as tops for skirts or jeans, but did not establish that such use predominated over the sleepwear use.

While there was conflict concerning the recognition in the trade of the use of the merchandise as chiefly as nightwear, plaintiff established that its merchandise is recognized in the fashion industry as pajamas and other nightwear, through the testimony of buyers for national chains of retail stores and of a professor of sleepwear design at the Fashion Institute of Technology.

Although the defendant established that some of plaintiff's merchandise is being worn as tops for pants and skirts, or dresses or beach cover-ups, it was unable to rebut plaintiff's evidence that the chief use, that which exceeds all other uses, is as sleepwear. Some of defendant's witnesses gave their expert opinion that the merchandise could be worn as sportswear, but their knowledge did not extend to what use the merchandise is put throughout the United States, since most of defendant's witnesses were familiar with the New York metropolitan area market for the merchandise and did not testify concerning the uses of the class or kind of the merchandise throughout the United States.

For example, defendant relied on the testimony of Professor Carolyn Harrigan, also an instructor at the Fashion Institute of Technology for twenty-five years, and who is a specialist in sportswear and in active wear. However, Professor Harrigan has not taught, nor taken courses in, sleepwear design or production and she had no marketing experience. Her testimony concerning the 25 garments at issue related to how the garments *would* be worn or used and was based mainly on the type of print on the fabric. She also testified as to how the garments *could* be worn, but her experience as to actual use was limited to purchases of garments for herself and two teenage children and the manner in which her 900 students at the Fashion Institute of Technology dress.

Additionally, the Court has examined the merchandise *in camera* and concludes that it is a nightwear garment, particularly in light of our appeals court's holding that the merchandise itself may be

strong evidence of use. *United States* v. *Bruce Duncan Co.,* 50 CCPA 43, 46, C.A.D. 817 (1963). Having found that the merchandise consists of nightwear, it is unnecessary to decide whether the merchandise is more than dresses, blouses and shirts, plaintiff's alternative claim.

Accordingly, the Court finds, based on the testimony of the witnesses, the exhibits and the *in camera* inspection of the merchandise, that the merchandise is nightwear and entitled to enter the United States under item no. 383.3020, TSUS and under Textile Quota No. 351.

Judgment is entered accordingly.